Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Plaintiff-Appellant,

v.

DISTRICT LODGE NO. 100, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO, Defendant-Appellee.

No. 79–3858.

United States Court of Appeals, Fifth Circuit.*

Unit B

Feb. 1, 1982.

William Taylor, III, Beate Bloch, U. S. Dept. of Labor, Washington, D. C., Bobbye Spears, Regional Sol., U. S. Dept. of Labor, Atlanta, Ga., for plaintiff-appellant.

Jos. P. Manners, George H. Tucker, Miami, Fla., for defendant-appellee.

Before TJOFLAT, HATCHETT and THOMAS A. CLARK, Circuit Judges.

THOMAS A. CLARK, Circuit Judge:

By authority granted in Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 401 et seq.,[1] the Secretary of Labor, appellant, asked the district court to set aside a 1975 election of officers of District Lodge No. 100, International Association of Machinists

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

1. The enforcement provisions of the Act provide:

(a) A member of a labor organization—
(1) who has exhausted the remedies available under the constitution and bylaws of such organization and of any parent body, or
(2) who has invoked such available remedies without obtaining a final decision within three calendar months after their invocation,

may file a complaint with the Secretary within one calendar month thereafter alleging the violation of any provision of section 481 of this title (including violation of the constitution and bylaws of the labor organization pertaining to the election and removal of officers). The challenged election shall be presumed valid pending a final decision thereon (as hereinafter provided) and in the interim the affairs of the organization shall be conducted by the officers elected or in such other manner as its constitution and bylaws may provide.

(b) The Secretary shall investigate such complaint and, if he finds probable cause to believe that a violation of this subchapter has occurred and has not been remedied, he shall, within sixty days after the filing of such complaint, bring a civil action against the labor organization as an entity in the district court

and Aerospace Workers, AFL–CIO. Both parties moved for summary judgment. The district court granted the union's motion and entered judgment. The United States appeals. Because the district judge decided material issues of fact on motion for summary judgment, we reverse.

### The Facts

The defendant-appellee, District Lodge No. 100, is an intermediate body of the International Association of Machinists and Aerospace Workers, AFL–CIO with, at the time of the challenged election, 13,177 members in 43 locals, spread from Miami to Anchorage, Hartford to Los Angeles. District 100 is not a district in the sense that its membership is confined to a geographical region; more accurately it is an employer district. Most of the membership is employed by Eastern and locals exist almost everywhere that carrier operates. The size of a local is generally proportional to the Eastern traffic serviced at that airport. Miami, Eastern's base of operations, has a local membership of 5,370. Other hubs of the airline's transportation network have large locals: Atlanta–1,280; Kennedy–1,970. Other cities with smaller Eastern operations, some at large airports, have very small locals: San Francisco–2; Anchorage–2; Toronto–2; Minneapolis–9; Columbus–7.

The defendant union has established detailed procedures for the nomination and election of its governing officers: president and general chairman, vice president, secretary-treasurer, and nine Executive Board members. The government does not challenge the election procedures. Provisions are made for absentee voting and opportunity is provided for night workers to vote during the election. The Labor Secretary limits his complaint to nomination procedures.

In order to qualify as a candidate, district by-laws require a member to be nominated by at least four local lodges. In the event that more than two candidates for any office received four nominations, only the names of the two candidates with the greatest number of nominations appear on the ballot. Each local lodge may nominate only one candidate for each office. If the members of a local lodge nominate more than one person for a particular office, an election is held at the same nomination meeting to determine the official nominee of the local lodge.[2] When such a nomination election is held, absentee ballots are not used. In granting the union's motion for summary judgment, the district court found these nomination procedures reasonable and thus permissible under the LMRDA.

The district office directed locals to make nominations at the regular July 1975 meetings. The Cleveland and San Antonio locals failed to hold such meetings for lack of a quorum. At the meetings in San Francisco and Jacksonville, nominations were not solicited. Other locals held nomination meetings at a variety of times and on different dates throughout the month of July. The meetings were poorly attended. In many cases as few as 5% of the eligible membership participated. The best attended meeting, of which we are aware, was held at midnight in Newark, New Jersey. Approximately 100 of 328 eligible members attended. Nearly 100 of the members were working when the meeting was held.

Some members faced unusual obstacles to their attendance at meetings. The parties stipulated that Local 2319 held its election in Tampa and 22 of its members lived and worked in Pensacola and Tallahassee, Florida. Local 1690 met in Atlanta. Fifty-five

of the United States in which such labor organization maintains its principal office to set aside the invalid election, if any, and to direct the conduct of an election or hearing and vote upon the removal of officers under the supervision of the Secretary and in accordance with the provisions of this subchapter and such rules and regulations as the Secretary may prescribe. The court shall

have power to take such action as it deems proper to preserve the assets of the labor organization.
29 U.S.C. § 482.

2. The only exception is Local 702 in Miami, Florida, which has an all-day election subsequent to the nomination meeting.

of its members live and work in Birmingham and Mobile, Alabama and Greenville, South Carolina. Employees of Eastern may fly standby for a small service charge. This may have eased the burden on those who lived and worked far from meetings, but the distances were an obstacle to voting nevertheless.

Low attendance may have resulted in part because a large number of members were working while meetings were held: typically, one of every three eligible members. Eastern had a policy of allowing shift switching and similar devices as operational needs would permit in order to allow members to attend meetings.

Few union members participated in the nomination process. The principal employer has a twenty-four hour operation. Some members must work during meetings. Some locals have members who work and live far from the central union meeting places. These things are beyond the control of the union. Nonetheless, the record indicates little effort by the union to minimize the obstacles to participation in the nomination process. Absentee voting for nominees is not permitted. Except for the Miami local, all-day nomination elections are not held. In short, the union does not encourage participation in nominations. On the other hand, when elections are held, absentee ballots are permitted. The record is unclear as to why nominations and elections are treated differently. "I don't care who does the electing," New York's William Marcy "Boss" Tweed once remarked, "just so I can do the nominating." The union's policies regarding nomination meetings raise at least the specter of entrenched leadership. We have insufficient evidence of union motive and the effect of these policies to flesh out the ghost of entrenchment.

### The Applicable Law

In the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. §§ 401–531, "Congress chose the goal of

'free and democratic' union elections as a preventive measure 'to curb the possibility of abuse by benevolent as well as malevolent entrenched leadership.' " [3] In order to achieve that free election goal, Congress enacted specific provisions such as that in issue here.

(e) In any election required by this section which is to be held by secret ballot a *reasonable opportunity* shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to section 504 of this title and to *reasonable qualifications* uniformly imposed) and shall have the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization or any member thereof. Not less than fifteen days prior to the election notice thereof shall be mailed to each member at his last known home address. Each member in good standing shall be entitled to one vote. No member whose dues have been withheld by his employer for payment to such organization pursuant to his voluntary authorization provided for in a collective bargaining agreement shall be declared ineligible to vote or be a candidate for office in such organization by reason of alleged delay or default in the payment of dues. The votes cast by members of each local labor organization shall be counted, and the results published, separately. The election officials designated in the constitution and bylaws or the secretary, if no other official is designated, shall preserve for one year the ballots and all other records pertaining to the election. The election shall be conducted in accordance with the constitution and bylaws of such organization insofar as they are not inconsistent with the provisions of this subchapter.

29 U.S.C. § 481 (emphasis supplied).

The Secretary of Labor based his complaints on the reasonable opportunity and

3. *Local 3489, United Steelworkers of America, AFL–CIO v. Usery,* 429 U.S. 305, 309, 97 S.Ct. 611, 615, 50 L.Ed.2d 502 (1977), *quoting Wirtz*

*v. Hotel Employees,* 391 U.S. 492, 503, 88 S.Ct. 1743, 1750, 20 L.Ed.2d 763 (1968).

reasonable qualifications provisions above. The questions to be determined are (1) whether members had a reasonable opportunity to participate in the nomination process and (2) if the rule limiting candidacy to the top two candidates nominated by at least four unions (4/2 rule) was a reasonable qualification for office. These determinations must be made in light of the problem which Congress recognized and the method by which it chose to attack that problem. "The legislative history and wording of section 401(e) reveal a congressional purpose to ensure open and democratic union elections and to limit candidacy restrictions to those that do not invite abuse, especially by entrenched incumbents."[4]

A goal of the Act is "to protect the rights of rank and file members to *participate fully* in the operation of their union through processes of democratic self-government."[5]

### An Improper Use of Summary Judgment

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c).

On a motion for summary judgment the court must determine the existence or non-existence of a genuine issue of material fact. The trial judge must decide only whether such an issue exists, not how it should be decided.[6] The district judge recognized a potential problem existed which was not resolved because both parties requested summary judgment.

THIS CAUSE is before the court on cross-motions for summary judgment. Finding no material facts to be in issue, the court concludes that judgment, as a matter of law, should be entered in favor of defendant. F.R.Civ.P. 56.

In examining the law governing summary judgments, the court notes that the filing of cross-motions does not establish that there is no material fact in issue and that a trial is therefore unnecessary. 10 Wright and Miller, *Federal Practice and Procedure* § 2720. The Court must still make an independent evaluation as to the merits of each party's motion. *Id.* In this case, however, the court is of the opinion that a trial is unnecessary and that the case can be disposed of on summary judgment. *See Dow Chemical Co. v. Ashland Oil, Inc.*, 579 F.2d 902 (5th Cir. 1978).

Record at 399.

The court nonetheless made certain "determinations." He concluded, for example, that employees were "never deprived of an opportunity to attend nomination meetings." Plaintiffs had asserted work assignments and distance prevented attendance. Defendant argued that generous employer policies made attendance only inconvenient. The judge decided that dispute.

On the nominations qualification issue, the district judge found that "the requirement of nominations from four local unions out of a total of 43 actually promotes more democratic elections, rather than hinders them." Certainly, this was disputed by the plaintiffs.

The court did more than find no material fact was in issue; he decided such facts. Such a procedure would of course be permissible under Fed.R.Civ.P. 52. Had Rule 52 been utilized, we would have before us

---

4. *Usery v. Local Div. 1205, Amalgamated Transit Union*, 545 F.2d 1300, 1303 (1st Cir. 1976); see *Wirtz v. Hotel Employees, Local 6*, 391 U.S. 492, 499, 88 S.Ct. 1743, 1748, 20 L.Ed.2d 763 (1968); *Wirtz v. Local 153, Glass Bottle Blowers*, 389 U.S. 463, 470–71, 88 S.Ct. 643, 647–648, 19 L.Ed.2d 705 (1968); *see also* Aaron, The Labor-Management Reporting and Disclosure Act of 1959, 73 Harv.L.Rev. 851 (1960).

5. *Wirtz v. Hotel, Motel and Club Employees Union, Local 6*, 391 U.S. 492, 497, 88 S.Ct. 1743, 1747, 20 L.Ed.2d 763, 769 (1968) (emphasis supplied).

6. *Commercial Metals Co. v. Walker*, 439 F.2d 1103, 1104 (5th Cir. 1971).

findings of fact and conclusions of law and our review would be facilitated. We are faced with reviewing a decision-making process which ideally builds findings of fact from substantial evidence, ultimate facts from inferences permissible from the findings of fact, and conclusions of law from the ultimate facts. Fact, ultimate fact, and conclusion distinctions are impossible to make, but the thought process chain must be available for review. Here it is not. Our review is limited to a determination of whether the trial judge correctly determined that because there was no genuine issue of material fact, the summary judgment was appropriate.[7] Because genuine issues existed, we reverse.

The determination required here is not unlike those involved in negligence cases. Negligence issues are rarely appropriate summary judgment subjects. In a negligence case, even though many factual questions are undisputed, the reasonableness of the defendant's action is a genuine issue of material fact.[8]

In this case, the district judge held that the union members had a *reasonable* opportunity to participate in the nomination process and the rules governing the nomination process were *reasonable* as a matter of law. Like a negligence case, these reasonableness determinations are an inappropriate subject for summary judgment. The case before us illustrates the dangers of the summary disposition of reasonableness questions. If this court were to affirm, we would hold, as a matter of law, that a reasonable opportunity to vote exists when an employer has an established policy of allowing shift switching, time off, etc. The rule thus established would govern a situation in which such policies existed but because of other circumstances workers never avail themselves of the opportunities presented. Reasonableness must be determined in light of all the circumstances. When a trial judge makes that determina-

tion, he resolves a material issue—an exercise inappropriate in summary judgment.

*Full Participation in the Nomination Process*

The district court found that union members were not deprived of a reasonable opportunity to participate in the nomination process.

From the sworn statement of William Winpisinger, It seems clear that employees were never deprived of an opportunity to attend nominations meetings. Although attendance may have inconvenienced some employees, they were not unable to attend. In this regard, the court agrees with defendant that the statutory language "reasonable opportunity" requires the court to determine if the practices employed were "so lacking in democratic principles and so unfair, in denying a reasonable opportunity to vote to a significant number of members, that the election must be voided." *Hodgson v. Local Union*, 350 F.Supp. 16, 19 (C.D.Cal. 1972). Here they clearly were not. The employees could have made arrangements to vote. In this regard, the court notes that absentee ballots have not been required in other situations unless it was shown that employees absolutely could not attend. *Id.* citing *Goldberg v. Marine Cooks and Stewards Union*, 204 F.Supp. 844 (N.D.Cal.1962); *Wirtz v. National Maritime Union*, 284 F.Supp. 47 (S.D.N.Y. 1968). *See also Hodgson v. Local Union No. 920, Industrial and Allied Workers & Helpers Etc.*, 327 F.Supp. 1284 (E.D.Tex. 1971). This conclusion is further supported by the inescapable consideration that the airline industry must operate around the clock, and at locations through its route system.

Record at 100–01.

It is not enough that employees could have made arrangements to vote; full participation by rank-and-file is the goal of the

---

7. *Central Oil & Supply Corp. v. United States*, 557 F.2d 511 (5th Cir. 1977).

8. *Croley v. Matson Navigation Co.*, 434 F.2d 73 (5th Cir. 1970). *See also* C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2729 at 570–74 (1973).

Act.[9] This nomination process, as we view it on the facts in this record, discourages full participation. Although it may not be impossible for some members to attend, there was evidence that it was at least difficult. The district judge should not have decided this issue on summary judgment. Such an effect might be reasonable if the union had a valid purpose for its rules. There is no indication why absentee ballots and all-day voting is permitted for the elections and not for nomination meetings. The burden associated with these devices is certainly no greater at the nomination stage. No valid purpose was shown for the rule. A rule which restricts participation without a valid purpose is unreasonable.[10] On the facts before us, the District 100 nomination process unreasonably denies members an opportunity to vote.

On remand the district court should consider any evidence which would indicate a valid purpose served by the rules. Evidence as to any actual impact on full participation should be considered. Particularly helpful would be testimony as to burdens faced by individual union members. The inquiry should be into whether full participation is discouraged, not whether the members absolutely could not attend.

### Unreasonable Candidacy Qualifications

As to the government's claim "that defendant violated portions of § 481(e) by imposing the requirements that candidates receive nominations from at least four local lodges, and that only the top two nominees can run for office," the district court responded:

> The Court has considered *Usery v. Dist. 22 United Mine Workers*, 543 F.2d 744 (10th Cir. 1976) and finds that it is distinguishable from this case. As argued by defendant, the preliminary support requirements in *District 22, supra* were much more severe than those present here, and clearly they resulted in the exclusion of "an undetermined number of

otherwise qualified candidates for reasons unrelated to their ability to fulfill the duties of the office." *Id.* The result in that case was further supported by evidence that previous elections were often uncontested. There is no evidence of that sort in this case.

> The Court further agrees with defendant that the requirement of nominations from four local unions out of a total of 43 actually promotes more democratic elections, rather than hinders them. Finally, the court does not consider the limitation of the top two candidates to be a violation of the Act. By requiring majority vote for election, the rule ensures widespread support and responsive leadership.

Record at 401.

As the district court recognized, free and democratic elections are the goals of § 481(e).

The Supreme Court has held that the statute was designed to guarantee free and democratic union elections similar to the model of our political elections, and that the permitted "reasonable qualifications" on eligibility to hold office were intended to have only a narrow reach. *Steelworkers v. Usery*, 429 U.S. 305, 97 S.Ct. 611, 50 L.Ed.2d 502 (1977); *Wirtz v. Hotel, Motel & Club Employees Union, Local 6*, 391 U.S. 492, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968).

*Marshall v. Local 1402, Intern. Longshoremen's Ass'n, AFL–CIO*, 617 F.2d 96, 98 (5th Cir. 1980).

In the only case involving local union endorsements as a showing of preliminary support under the Act, *Usery v. District 22, United Mine Workers*, 543 F.2d 744 (10th Cir. 1976), a requirement of five or more local nominations, out of 16 locals, in three states, was held unreasonable.

The local unions within District 22 vary greatly in size—the largest having 731 eligible voters in 1973, the smallest having only 29. It was possible for a candi-

---

9. *Local 3489, United Steelworkers of America, AFL–CIO v. Usery*, 429 U.S. 305, 97 S.Ct. 611, 50 L.Ed.2d 502 (1977).

10. *Marshall v. Local 1402, Intern. Longshoremen's Ass'n*, 617 F.2d 96, 98 (5th Cir. 1980).

date to be nominated by the five smallest locals representing approximately five percent of total district membership, while another candidate could obtain nominations from the four largest locals representing 58 percent of the membership and not qualify for a place on the ballot. In this election the three locals nominating Roybal represented 38 percent of voting membership and the eleven nominating Stevenson represented 48 percent. Union records show that other members were denied the opportunity to be candidates for various offices, but only Roybal exhausted internal union remedies.

The history of this nominating procedure demonstrates a tendency toward one-candidate elections. Since records were first kept in 1957, the average number of candidates for each office in District 22 has been 1.75. Since 1957 no election for International board member has been contested. Since 1965 only two of six district-wide offices have had contested elections. In the 1973 election only one of seven offices had opposing candidates. Over the years the requirements for nomination have become more stringent as the number of locals has decreased from 27 in 1962 to 16 in 1973.

Based on this evidence the district court held the Union's requirement of nominations by five local unions did not provide a "reasonable opportunity" for nomination of candidates for union office.

*Id.* at 747–48 (footnotes omitted).

The burden imposed on candidates for office in District Lodge 100 exceeds that in *District 22*. District Lodge 100's jurisdiction encompasses not three states but the entire continental United States, parts of Canada, and Puerto Rico. A candidate in District 100 cannot concentrate his or her efforts on a minimum number of locals, but must accumulate as many local lodge nominations as possible in order to win over competing candidates. In order to do this, a candidate must campaign at locals spread throughout the United States.

The District 100 rule has potential for exclusion of "a candidate supported by a majority of the members." The forty-three locals affiliated with the district lodge range in size from as few as two members eligible to vote (Local Lodge 601, Anchorage, Alaska) to as many as 5,370 (Local Lodge 702, Miami, Florida). The two candidates nominated by the seven smallest locals (47 total members) and the six next smallest locals (145 total members) would preclude the candidate nominated by the five largest locals (9,572 total members) from appearing on the ballot. In the 1975 election, Matthew Jasinski was nominated by five locals with a combined eligible membership of 2,619. Virgil Howard was nominated by 10 locals with a combined membership of 2,343. Howard was permitted on the ballot; Jasinski was not. The qualification at issue does not serve its stated goal of assuring that only the most viable candidates appear on the ballot. A candidacy qualification which "may exclude an undetermined number of otherwise qualified candidates for reasons unrelated to their ability to fulfill the duties of the office" is unreasonable. *Id.* at 748.

Public voting cases provide an inexact but helpful analogy.[11] Political elections provide a model. The Supreme Court has recognized that large disparities in the size of voting units favor the less populous units. In *Moore v. Ogilvie*, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), the Court struck down an Illinois election law which required independent candidates to secure at least 25,000 signatures on nominating petitions, of which at least 200 signatures had to be from each of at least 50 of the state's 102 counties. Ninety-three percent of the state's voters resided in the 49 most populous counties, 6.6 percent in the remaining 53 counties. The electorate in the 49 counties with 93.4 percent of the registered voters could not place an independent

11. *Usery v. District 22, United Mine Workers of America*, 543 F.2d 744, 748–49 (10th Cir. 1976).

candidate on the ballot, yet 25,000 of the remaining 6.6 percent of registered voters properly distributed among the remaining 53 counties would be able to place an independent candidate on the ballot.

Nearly 95 percent of the eligible members of District Lodge 100 are assigned to the 21 most populous local lodges. The remaining 22 local lodges, a majority, contain only five percent of the membership. A candidate supported by the 22 smallest local lodges (a total of 667 members) can be assured of a place on the ballot. Another candidate supported by the three largest locals (8,620 members, 65.4 percent of the total membership) does not meet even the minimum requirement of four local lodge nominations.

Under these facts it is unclear how democratic elections are promoted by the 4/2 rule. On remand the district court should consider under all the circumstances the rule's "effect on free and democratic processes of union government." *Steelworkers v. Usery*, 429 U.S. 305, 310–11 n.6, 97 S.Ct. 611, 615, 50 L.Ed.2d 502 (1977). Crucial consideration will include examination of the district's election history, the need to eliminate frivolous candidates, and the extent to which the current rule accomplishes that objective.

### Conclusion

Congress has recognized that there is no litmus test which may be applied to a union in order to determine the extent to which it is performing its economic and social functions. Rather, the Congress has placed its faith in open and free elections in which member participation is encouraged. On the other hand, if unions are to perform their function, they must be free to establish rules by which they choose new or retain old leadership. To insure a balance, we are charged with measuring the reasonableness of rules in light of their potential effectiveness and possible detriment. To do this, our understanding of the machinery under scrutiny must be nearly complete. Reasonableness is to be determined in light of all the circumstances; we do not know all the circumstances here. We note that the procedures utilized by the district seem, on the facts we have before us, to invite abuse and to discourage open and democratic election.[12] We must, therefore,

REVERSE AND REMAND.